# NO. 12-20-00055-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *JERRY WAYNE RHONE,*<br>*APPELLANT* | § | *APPEAL FROM THE 349TH* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *THE STATE OF TEXAS,*<br>*APPELLEE* | § | *HOUSTON COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Jerry Wayne Rhone appeals his conviction for theft. In two issues, Appellant urges that the evidence is insufficient to support his conviction and that his sentence is disproportionate to the crime for which he was convicted. We affirm.

## BACKGROUND

Appellant was charged by indictment with theft of more than $200,000. The indictment further alleged that the theft was pursuant to one scheme or continuing course of conduct. It alleged that Appellant, along with his wife Jeannine, stole approximately $972,000 from the owner of the Houston County Courier (the Courier) over the course of a five-year period. Appellant pleaded "not guilty," and the matter proceeded to a jury trial. The jury found Appellant "guilty" and sentenced Appellant to twenty-five years imprisonment. Appellant was further ordered to pay $972,112.21 in restitution. This appeal followed.

## SUFFICIENCY OF THE EVIDENCE

In his second issue, Appellant urges the evidence is insufficient to support his conviction. Specifically, he urges that the evidence does not support the jury's finding that he was the person who committed the theft in question.

**Standard of Review**

In Texas, the ***Jackson v. Virginia*** legal sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt. ***Brooks v. State***, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). Legal sufficiency is the constitutional minimum required by the Due Process Clause of the Fourteenth Amendment to sustain a criminal conviction. *See **Jackson v. Virginia***, 443 U.S. 307, 316–17, 99 S. Ct. 2781, 2786–87, 61 L. Ed. 2d 560 (1979). The standard for reviewing a legal sufficiency challenge is whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See **id***., 443 U.S. at 319, 99 S. Ct. at 2789. The evidence is examined in the light most favorable to the verdict. ***Id***. A successful legal sufficiency challenge will result in rendition of an acquittal by the reviewing court. *See **Tibbs v. Florida***, 457 U.S. 31, 41–42, 102 S. Ct. 2211, 2217–18, 72 L. Ed. 2d 652 (1982). This familiar standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the basic facts to ultimate facts. *See **Jackson***, 443 U.S. at 319, 99 S. Ct. at 2789.

Under this standard, we may not sit as a thirteenth juror and substitute our judgment for that of the fact finder by reevaluating the weight and credibility of the evidence. *See **Dewberry v. State***, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999); *see also **Brooks***, 323 S.W.3d at 899. Instead, we defer to the fact finder's resolution of conflicting evidence unless the resolution is not rational. *See **Brooks***, 323 S.W.3d at 899–900. When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination. ***Clayton v. State***, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Direct and circumstantial evidence are treated equally. ***Id***. Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. ***Hooper v. State***, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). The duty of a reviewing court is to ensure that the evidence presented actually supports a conclusion that the defendant committed the crime charged. *See **Williams v. State***, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

The sufficiency of the evidence is measured against the elements of the offense as defined by a hypothetically correct jury charge. *See **Malik v. State***, 953 S.W.2d 234, 240 (Tex.

Crim. App. 1997). Such a charge would include one that "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

**Applicable Law**

Texas law defines theft as the unlawful appropriation of property (including money) with the intent to deprive the owner of the property. TEX. PENAL CODE ANN. § 31.03(a) (West 2019). One appropriates property unlawfully by taking it without the owner's consent. *Id.* § 31.03(b). The value of property taken determines the grade of the offense. *Id.* § 31.03(e) (setting out monetary levels for stolen property as to each grade of misdemeanor and felony). Under the version of the statutes in force at the time, each offense was a first-degree felony when the aggregated property value was $200,000 or more. *See id.* former § 31.03(e)(7).[1] Texas law also permits a charging instrument to aggregate amounts obtained by theft "pursuant to one scheme or continuing course of conduct, whether from the same or several sources ...." *Id.* § 31.09 (West 2019). Such "conduct may be considered as one offense and the amounts aggregated in determining the grade of the offense." *Id.* The culpable criminal behavior of Section 31.09 is the scheme or continuing course of conduct, as opposed to each individual theft used to prove the scheme. *Kent v. State*, 483 S.W.3d 557, 561 (Tex. Crim. App. 2016).

The legislature did not define the term "one scheme or continuing course of conduct" as used in Section 31.09 of the Texas Penal Code. When interpreting a statute, we construe words and phrases according to the rules of grammar and common usage unless they have a technical or particular meaning. TEX. GOV'T CODE ANN. § 311.011(a) (West 2013); *Ex parte Ruthart*, 980 S.W.2d 469, 472 (Tex. Crim. App. 1998). Absent a technical definition provided by the statute, we give the phrase its common meaning and understanding. *Sendejo v. State*, 676 S.W.2d 454, 456 (Tex. App.—Fort Worth 1984, no pet.); *Lyon v. State*, No. 02-17-00195-CR, 2018 WL 6816209, at *7 (Tex. App.—Fort Worth Dec. 27, 2018, pet. ref'd) (mem. op., not designated for publication).

---

[1] In 2015, the legislature amended the monetary value for theft. The value for first-degree felony theft was increased from $200,000 or more to $300,000 or more. *See* Act of June 19, 1993, 73rd Leg., R.S., ch. 900, § 1.01, sec. 31.03, 1993 Tex. Gen. Laws 3586, 3638, *amended by* Act of June 20, 2015, 84th Leg., R.S., ch. 1251, § 10, sec. 31.03(e), 2015 Tex. Gen. Laws 4208, 4213 (codified at TEX. PENAL CODE ANN. § 31.03(e)(7)).

**Analysis**

Appellant contends the evidence is insufficient to support his conviction because the State failed to prove that he actually committed the alleged theft. Specifically, he urges that the State was only able to connect him to a limited amount; therefore, the State was required to prove that he was in concert with his spouse to show theft in excess of $200,000. Appellant posits that there is no evidence that he was aware of his spouse's theft or the amount of her theft.

Kelli Barnes testified that she has worked for Polk County Publishing Company since Alvin Holley purchased the Tyler County newspaper in 1992. Barnes offices in Livingston, Texas, and manages the group comprised of five newspapers. Barnes testified that Jeannine was employed by the Courier in various capacities prior to 2001; however, Jeannine became the manager of the Courier in 2001. Appellant came to work for the Courier approximately three months after Jeannine became manager. In 2014, Barnes became suspicious that something was happening with the Courier's books. She stated that, prior to 2014, she was the manager of the Tyler County newspaper and knew that the owner was repeatedly taking money from the Tyler County account to pay the Courier's bills. After Holley told Barnes about the situation with the Courier, she offered to manage the smaller newspapers in the group. She testified that the situation was surprising because the "Courier had been a moneymaker." In 2014, Barnes, Holley, and a bookkeeper named Deboraw McClusky went to the Courier to review the books. When they confronted Jeannine, she attempted to remove something from a file cabinet. Barnes escorted Jeannine off the premises. When Barnes returned, McClusky showed her a stack of personal bills for Appellant and Jeannine with the duplicates of Courier checks attached. Barnes testified that it appeared that the Rhones were paying their bills from the Courier's expense account but that the Courier's bills and taxes were not being paid.

Barnes asked the Courier's bank for copies of all checks written from the expense account for the previous five years. In reviewing the checks, they observed that "at least five different signatures" were used to sign Jeannine's name to the checks. Barnes further testified that it appeared the Rhones made more from the expense account than the payroll account and there was no reason for them to be receiving checks from the expense account. Appellant had been removed from the payroll in 2010, and Barnes testified that the month after Appellant was removed from the payroll, the Rhones began taking "that much more out of the expense account, the very next month." The expense account had been used to pay the Rhones' Dish Network,

4

Direct TV, electric, and mortgage bills. And several members of the Rhone family received expense payments when they were neither salaried employees nor performed contract labor. Specifically, the only members of the Rhone family that were employed by the Courier were Jeannine, Appellant, and their daughter-in-law, Crystal Rhone. However, Jerry T. Rhone (Appellant's son who was known as "Bud") and Candice Ellington (Appellant's daughter) also received payments and were never employed by the Courier. As far as Barnes was aware, only Appellant's son-in-law, Jonathan Ellington, was ever a contract laborer for the Courier.

McClusky testified that she is Polk County Publishing's accountant. McClusky stated that, in 2014, the publishing company's CPA firm indicated there were some irregularities with the Courier's books. In addition, the Courier was behind on some accounting paperwork from 2012. After learning of the irregularities, McClusky accompanied Barnes and Holley to the Courier. When they arrived at the Courier, they told Jeannine that they were there to review the books and that she was on paid leave until further notice. McClusky logged into the computer looking for spreadsheets or other financial recordings and found none. McClusky testified to what she found when she began looking through the filing cabinets:

> What I found was in the file cabinet, in the bottom drawer of the file cabinet, was a whole stack of lots and lots of personal bills, and there were carbon copies of checks that were stapled to her personal bills, but the check was made out to maybe the post office and the dollar amount matched the bill – her personal bill. So they were made out to different people or different, you know, like things that were company business, but it was actually stapled with her bill on it. Like for electricity or Verizon payments. Dish Network, mortgage company.

McClusky identified a few carbon copies of checks that were used to pay for the Rhones' bills. She testified that "there were more than 100. I mean, there were lots and lots." After she realized that the carbon copies did not match the bills, she asked the bank for the check copies. McClusky testified that she went through the 2012 and 2013 bank statements and made a check register based on which checks cleared the bank. McClusky placed the spreadsheets onto a disc. The disc and corresponding spreadsheets were admitted into evidence. During her testimony, McClusky reviewed her spreadsheets line by line and detailed which expenses did not belong to the Courier. She testified that all of the non-Courier expenses paid for a Rhone family expense. Jeannine received money in addition to her normal salary. And the remainder of the Rhone family also received money from the expense account, even if not employed by the Courier.

5

McClusky testified that Appellant, Candice, Jerry T., Crystal, and Jeannine were all receiving payments from the expense account. And, as employees, they should not have been receiving those payments.

Toni Browning, the Courier's managing editor, testified that she has been employed by the Courier since 2008 and has been the managing editor for four years. Browning was familiar with both Appellant and Jeannine and knew Appellant was released in 2010. She further stated that she never saw Appellant or Jerry T. perform any contract work. Crystal was a salaried employee. Candice helped Jeannine with the books once in 2013, and Jonathan performed some roof work back in 2008, but she had not seen him perform any further contract labor since then.

Kristie Wixson testified that she works for the Regional Organized Crime Information Center, a grant agency for the Texas Department of Criminal Justice, as a criminal intelligence analyst. She reviewed the Courier's operating and payroll accounts, as well as Appellant's and Jeannine's Prosperity Bank account. After she analyzed the bank records, she drafted a report, which was admitted into evidence. According to her analysis, the Rhone family received $832,259.72 from the expense account from 2009-2013. That amount includes money received by Jeannine, Jerry T., Crystal, Candice, and Jonathan. Wixson learned the morning of trial that Jerry T. and Appellant are two different people, so the amounts received by them are lumped into one category on her report. Her analysis also showed that checks were written for the Rhones' personal expenses, which included CenterPoint Energy, Citi Mortgage, Dish Network, TXU Energy, and Verizon Wireless. The total for those from 2009-2013 were as follows: $9,147.06 for CenterPoint, $20,979.01 for Citi Mortgage, $9,576.98 for Dish Network, $85,088.83 for TXU Energy, and $22,279.50 for Verizon Wireless. Wixson further testified that her analysis showed no cash withdrawn from the expense account in 2009 and 2010. However, $51,276.75 was withdrawn in 2011, $11,913 in 2012, and $38,990.50 in 2013 for a total of $102,180.25. The expense account also accrued $13,776.08 in insufficient funds fees during those five years. Wixson reviewed the payroll account for the year 2012. In 2012, Jeannine and Crystal were the only Rhone family members to receive money from the payroll account. Jeannine received $29,176.82, and Crystal received $13,328.90.

Wixson's analysis of Rhones' personal account showed that Jeannine deposited $467,122.46 from the expense account into the Rhones' account from 2009 through 2014. Appellant appeared to have deposited $78,109 from the Courier's expense account into the

6

personal account. At the conclusion of her report, Wixson concluded that the Rhone family obtained $972,112.21 from the Courier's expense account from between 2009 and 2014.

Holley, the owner of Polk County Publishing, testified that he acquired the Courier in 1980. Jeannine began working at the Courier prior to 2001 but was the general manager from 2001 until 2014. Holley heard reports from Courier employees about Jeannine and he was suspicious; however, he had no tangible proof that anything inappropriate was happening at the Courier. In 2012, the accountant that he had used for years refused to continue to work with the Courier, which Holley found alarming. In 2014, Holley, Barnes, and McClusky went to the Courier to confront Jeannine and investigate. When they began looking through Jeannine's office, they found "she had things hidden in certain places that had information that was incorrect as far as [the] books." And they discovered that the information did not match what she had been turning into the publishing company. Holley testified that they further found that the Courier had been paying Jeannine's personal bills. Holley testified that he had not given Jeannine or any other member of the Rhone family permission to take money from the expense account. He explained that the money coming out of the Courier's expense account prevented the Courier from operating without Holley sending money to cover the bills. According to Holley, Appellant was released from the Courier in November 2010 because his position was no longer needed and, to Holley's knowledge, Appellant did not perform contract labor after his release.

Randy Hargrove, an investigator for the Houston County District Attorney's Office, testified that he and the District Attorney "looked at hundreds and hundreds of checks and signatures to try to see if someone other than just one person had been cashing some of the checks." Hargrove contacted a handwriting expert for assistance. Hargrove testified that the District Attorney's Office chose certain checks to send to the analyst because sending all the checks would have been too voluminous. Therefore, Hargrove chose checks that did not resemble the majority. In addition to the selected check copies, Hargrove sent handwriting samples to the analyst. Hargrove observed Appellant fill in and sign the sample checks that were sent to the analyst. Hargrove testified that, in his lay opinion, the majority of the checks were not written by Jeannine based on the way she wrote her "J."

Keelie Johnson testified that she works at the Texas Department of Public Safety Crime Laboratory in Austin, Texas. In her capacity as a forensic document examiner, she performs

7

scientific examination, comparisons, and analysis of documents to determine their origin, authenticity, and ownership. She performs handwriting comparisons, document enhancements, and document authentications. Johnson testified that each person develops individual characteristics that create a habitual writing pattern that is unique to each individual. In this case, Johnson testified that she was provided thirteen reproductions of bank statements containing check images from the Courier's account. She was also provided handwriting exemplars from Appellant and examined Appellant's driver's license signature. After examining the checks and samples of Appellant's handwriting, Johnson made the following conclusions:

> There are indications that Jerry Rhone may have written all portions on the front side and the endorsement signature on the backside of check 37105.
>
> . . .
>
> There are indications that Jerry Rhone may have written the endorsement signature on the backside of check 37607.
>
> . . .
>
> There are indications that Jerry Rhone may not have written the maker's signature or the dollar amount on the front side of check 37607. And there is no basis for an identification or elimination of Jerry Rhone as having written any of the remaining portions of check 37607.
>
> . . .
>
> There are indications that Jerry Rhone may not have written any portions of the front side of check 37881. And there is no basis for an identification or elimination of Jerry Rhone as having written the endorsement signature on the backside of 37881.
>
> . . .
>
> There are indications that Jerry Rhone may have written the endorsement signature on the backside of check 40117; however, the evidence to that effect is far from conclusive.
>
> . . .
>
> There are indications that Jerry Rhone may not have written any portions of the front side of check 40117.
>
> . . .
>
> There is no basis for an identification or elimination of Jerry Rhone as having written any portions of the front side or the endorsement signature on the backside of check 38046.
>
> . . .
>
> There is no basis for an identification or elimination of Jerry Rhone as having written any portions of the front side or the endorsement signature on the backside of check 38455.

A copy of Johnson's report and findings was admitted into evidence.

Appellant also testified at trial. According to Appellant, Jeannine worked for the Courier from 1982 until her release in 2014. Appellant began working for the Courier after Jeannine became general manager in 2001. He received a salary while employed but testified that he was paid extra for taking pictures for the paper. Appellant further testified that he continued doing contract work after his release from the Courier in 2010. However, he did not complete a form W-9 or receive a form 1099 for that contract work. Appellant testified that Jeannine took care of the household finances and paid all the bills. When they got paid, he took the checks to the bank but "never got to really see it." He endorsed his check and Jeannine endorsed hers. Appellant further claimed that he did not write any of the Courier checks Jeannine allegedly wrote. He specifically denied writing the checks referenced in Johnson's report. He denied having any idea regarding what was occurring with the finances. Appellant testified that Jeannine told him in the past that she received loans from Holley, but he assumed they were consensual, and it had been worked out with Holley. He told the jury that he did not take money from the Courier, he was unaware that Jeannine took money from the Courier, and he neither encouraged nor asked Jeannine to take money from the Courier.

On appeal, Appellant contends the evidence is insufficient to prove that he was aware of Jeannine's theft or that he was involved. However, as the sole judge of the weight and credibility of the evidence, the jury was entitled to discredit Appellant's explanations and reject his denials. *See* ***Brooks***, 323 S.W.3d at 899. In choosing to believe the testimony from other witnesses, the jury could reasonably determine that Appellant wrote and signed Courier checks when he was not an authorized signatory, he endorsed checks that he should not have received, and he was not a contract laborer after his release from the Courier in 2010. Appellant's name was on $124,642.98 worth of the $972,112.21 paid to the Rhone family from 2009 through 2014. The evidence also supports a finding that Appellant deposited $78,109 worth of checks into his and Jeannine's personal account. Additionally, the evidence showed Appellant received benefits of $147,071.38 in bill payments. The sheer volume of money deposited into the Rhones' account gives rise to a reasonable inference that Appellant was not only aware of, but also participated in, the theft.

9

Therefore, viewing the evidence in the light most favorable to the verdict, we conclude that a rational jury could have found that Appellant committed the offense of theft of more than $200,000 and that the theft was part of an ongoing scheme or course of conduct. *See* TEX. PENAL CODE ANN. former § 31.03(e)(7); TEX. PENAL CODE ANN. § 31.09. We overrule Appellant's second issue.

## CRUEL AND UNUSUAL PUNISHMENT

In his first issue, Appellant argues that the twenty-five-year sentence imposed by the trial court is grossly disproportionate to the crime committed and amounts to cruel and unusual punishment.

"To preserve for appellate review a complaint that a sentence is grossly disproportionate, constituting cruel and unusual punishment, a defendant must present to the trial court a timely request, objection, or motion stating the specific grounds for the ruling desired." *Kim v. State*, 283 S.W.3d 473, 475 (Tex. App.—Fort Worth 2009, pet. ref'd); *see also Rhoades v. State*, 934 S.W.2d 113, 120 (Tex. Crim. App. 1996) (waiver of complaint of cruel and unusual punishment under the Texas Constitution because defendant presented his argument for first time on appeal); *Curry v. State*, 910 S.W.2d 490, 497 (Tex. Crim. App. 1995) (defendant waived complaint that statute violated his rights under the United States Constitution when raised for first time on appeal); *Mays v. State*, 285 S.W.3d 884, 889 (Tex. Crim. App. 2009) ("Preservation of error is a systemic requirement that a first-level appellate court should ordinarily review on its own motion[;] ... it [is] incumbent upon the [c]ourt itself to take up error preservation as a threshold issue."); TEX. R. APP. P. 33.1. A review of the record shows that Appellant lodged no objection to the constitutionality of his sentence at the trial court level, and has, therefore, failed to preserve error for appellate review. *See Kim*, 283 S.W.3d at 475; *see also Rhoades*, 934 S.W.2d at 120; *Curry*, 910 S.W.2d at 497; *Mays*, 285 S.W.3d at 889; TEX. R. APP. P. 33.1.

However, despite Appellant's failure to preserve error, we conclude his sentence does not constitute cruel and unusual punishment. The Eighth Amendment to the Constitution of the United States provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. amend. VIII. This provision was made applicable to the states by the Due Process Clause of the Fourteenth Amendment.

10

*Meadoux v. State*, 325 S.W.3d 189, 193 (Tex. Crim. App. 2010) (citing *Robinson v. California*, 370 U.S. 660, 666–667, 82 S. Ct. 1417, 1420–21, 8 L. Ed. 2d 758 (1962)).

The legislature is vested with the power to define crimes and prescribe penalties. *See Davis v. State*, 905 S.W.2d 655, 664 (Tex. App.—Texarkana 1995, pet. ref'd); *see also Simmons v. State*, 944 S.W.2d 11, 15 (Tex. App.—Tyler 1996, pet. ref'd). Courts have repeatedly held that punishment which falls within the limits prescribed by a valid statute is not excessive, cruel, or unusual. *See Harris v. State*, 656 S.W.2d 481, 486 (Tex. Crim. App. 1983); *Jordan v. State*, 495 S.W.2d 949, 952 (Tex. Crim. App. 1973); *Davis*, 905 S.W.2d at 664. Under the applicable law, Appellant was convicted of theft, a first-degree felony, the punishment range for which is no less than five years but no more than ninety-nine years or life in prison. *See* TEX. PENAL CODE ANN. §§ 12.32(a) (West 2019); former 31.03(e)(7). Thus, the sentence imposed by the trial court falls within the range set forth by the legislature. Therefore, the punishment is not prohibited as cruel, unusual, or excessive per se. *See Harris*, 656 S.W.2d at 486; *Jordan*, 495 S.W.2d at 952; *Davis*, 905 S.W.2d at 664.

Nevertheless, Appellant urges the court to perform the three-part test originally set forth in *Solem v. Helm*, 463 U.S. 277, 103 S. Ct. 3001, 77 L. Ed. 2d 637 (1983). Under this test, the proportionality of a sentence is evaluated by considering (1) the gravity of the offense and the harshness of the penalty, (2) the sentences imposed on other criminals in the same jurisdiction, and (3) the sentences imposed for commission of the same crime in other jurisdictions. *Id.*, 463 U.S. at 292, 103 S. Ct. at 3011. The application of the *Solem* test has been modified by Texas courts and the Fifth Circuit Court of Appeals in light of the Supreme Court's decision in *Harmelin v. Michigan*, 501 U.S. 957, 111 S. Ct. 2680, 115 L. Ed. 2d 836 (1991) to require a threshold determination that the sentence is grossly disproportionate to the crime before addressing the remaining elements. *See, e.g.*, *McGruder v. Puckett*, 954 F.2d 313, 316 (5th Cir. 1992), *cert. denied*, 506 U.S. 849, 113 S. Ct. 146, 121 L. Ed. 2d 98 (1992); *see also Jackson v. State*, 989 S.W.2d 842, 845–46 (Tex. App.—Texarkana 1999, no pet.).

We are guided by the holding in *Rummel v. Estelle* in making the threshold determination of whether Appellant's sentence is grossly disproportionate to his crime. 445 U.S. 263, 100 S. Ct. 1133, 63 L. Ed. 2d 382 (1980). In *Rummel*, the Supreme Court considered the proportionality claim of an appellant who received a mandatory life sentence under a prior version of the Texas habitual offender statute for a conviction of obtaining $120.75 by false

pretenses. *See id.*, 445 U.S. at 266, 100 S. Ct. at 1135. In that case, the appellant received a life sentence because he had two prior felony convictions—one for fraudulent use of a credit card to obtain $80 worth of goods or services and the other for passing a forged check in the amount of $28.36. *Id.*, 445 U.S. at 265–66, 100 S. Ct. at 1134–35. After recognizing the legislative prerogative to classify offenses as felonies and, further, considering the purpose of the habitual offender statute, the court determined that the appellant's mandatory life sentence did not constitute cruel and unusual punishment. *Id.*, 445 U.S. at 284–85, 100 S. Ct. at 1144–45.

In this case, the offense committed by Appellant—theft—is no less serious than the combination of offenses committed by the appellant in ***Rummel***, while Appellant's twenty-five-year sentence is far less severe than the life sentence upheld by the Supreme Court in ***Rummel***. Thus, it is reasonable to conclude that if the sentence in ***Rummel*** is not constitutionally disproportionate, neither is the sentence assessed against Appellant in this case. In his brief, Appellant makes a conclusory statement that his twenty-five-year sentence is grossly disproportionate, stating that other sentences for "much more serious theft cases" resulted in "significantly" less harsh sentences. However, he cites to no authority to support this contention. *See* TEX. R. APP. P. 38.1(i) ("[t]he brief must contain a clear and concise argument for the contentions made, with appropriate citations to the authorities..."). Because we do not conclude that Appellant's sentence is disproportionate to his crime, we need not apply the remaining elements of the ***Solem*** test. Appellant's first issue is overruled.

## DISPOSITION

Having overruled Appellant's first and second issues, we ***affirm*** the trial court's judgment.

BRIAN HOYLE
Justice

Opinion delivered January 21, 2021.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(DO NOT PUBLISH)



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**JANUARY 21, 2021**

**NO. 12-20-00055-CR**

**JERRY WAYNE RHONE,**
Appellant
V.
**THE STATE OF TEXAS,**
Appellee

---

Appeal from the 349th District Court

of Houston County, Texas (Tr.Ct.No. 16CR-103)

---

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

Brian Hoyle, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*